Slip Op. 07-109

# UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| **JAZZ PHOTO CORPORATION**, |
| Plaintiff, |
| v. |
| **UNITED STATES**, |
| Defendant. |

**Before:** Judge Timothy C. Stanceu

**Court No. 04-00494**

## OPINION AND ORDER

[Granting in part plaintiff's application for attorneys' fees and expenses under the Equal Access to Justice Act]

Decided: July 16, 2007

*Neville Peterson LLP* (*John M. Peterson*, *Curtis W. Knauss*, *George W. Thompson*, *Maria E. Celis* and *Catherine Chess Chen*) for plaintiff.

*Peter D. Keisler*, Assistant Attorney General, *Jeanne E. Davidson*, Director, *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Stefan Shaibani* and *David S. Silverbrand*); *Beth Brotman* and *Paul Pizzeck*, Customs and Border Protection, United States Department of Homeland Security, of counsel, for defendant.

Stanceu, Judge: Before the court is the application of Jazz Photo Corporation ("Jazz" or

"plaintiff") for attorneys' fees and other expenses under the Equal Access to Justice Act

("EAJA"), 28 U.S.C. § 2412(d) (2000).  The court conditionally grants the application in part

because the positions that the United States ("defendant") took before the United States Court of

Appeals for the Federal Circuit on two of the issues in the litigation – the issue of permissible

repair and the issue of segregation of merchandise – were not substantially justified.

## I.  BACKGROUND

The subject EAJA application arose from litigation involving Jazz's importations into the United States of certain "lens-fitted film packages" ("LFFPs"), which are more commonly known as "disposable cameras," "single use cameras," or "one-time use cameras."  The LFFPs that Jazz imported were previously-used LFFPs that had been fitted ("refurbished" or "reloaded") in China with new rolls of film and, for some models, new batteries for the flash mechanism.  Background information relevant to Jazz's EAJA application is presented in the opinion of the United States Court of Appeals for the Federal Circuit ("Court of Appeals") in *Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d 1094 (Fed. Cir. 2001) ("*Jazz I*"), the opinion of the United States Court of International Trade in *Jazz Photo Corp. v. United States*, 28 CIT __, 353 F. Supp. 2d 1327 (2000) ("*Jazz II*"), and the opinion of the Court of Appeals in *Jazz Photo Corp. v. United States*, 439 F.3d 1344 (Fed. Cir. 2006) ("*Jazz III*"), which affirmed the court's judgment in *Jazz II*. A summary of the background information pertinent to the court's ruling on plaintiff's EAJA application is presented below.

In its application, Jazz seeks, under 28 U.S.C. § 2412(d) (2000), legal fees and expenses paid to the law firm Neville Peterson LLP in litigation before the Court of International Trade and the Court of Appeals in *Jazz II* and *Jazz III*, respectively.  *Jazz II* arose from litigation that Jazz commenced in the Court of International Trade on October 4, 2004 to contest the denial by United States Customs and Border Protection ("Customs") of Jazz's administrative protest of the exclusion from entry of two of its shipments of LFFPs that were entered at the port of Los Angeles/Long Beach, California on August 26 and August 27, 2004.  *Jazz II*, 28 CIT at __, __, 353 F. Supp. 2d at 1329-30, n.2.  On September 24 and September 26, 2004, respectively,

Customs excluded all merchandise in the August 26 and August 27 shipments. *Id.* at 1329.  In so

doing, Customs ruled that the imported LFFPs were excluded from entry by a General Exclusion

Order and Order to Cease and Desist ("Exclusion Order") issued in 1999 by the U.S.

International Trade Commission ("ITC" or "Commission") pursuant to Section 337 of the Tariff

Act of 1930, as amended, 19 U.S.C. § 1337 (2000) ("Section 337").  *Id.* at 1329, 1331.  In 1998,

Fuji Photo Film Co., Ltd. ("Fuji"), the holder of various patents used in manufacturing LFFPs,

had initiated the Section 337 proceedings, in which the ITC determined that LFFPs imported by

Jazz infringed patents held by Fuji.  *Id.*; *see In the Matter of Certain Lens-Fitted Film Packages*,

USITC Pub. No. 3219, Inv. No. 337-TA-406 (Aug. 1999).  On or about September 26, 2004,

Jazz filed an administrative protest under 19 U.S.C. § 1514 contesting the exclusion of the

merchandise in the August 26 and August 27, 2004 shipments.  *Jazz II*, 28 CIT at __, 353 F.

Supp. 2d at 1329.  On September 29, 2004, Customs denied the protest, concluding that Jazz had

not established admissibility of the imported LFFPs.  *Id.* at 1330, n.2.

      During the litigation contesting the denial of the protest, the Court of International Trade

set an expedited trial schedule with the consent of both parties.  *Id.*  To establish admissibility of

its imported merchandise, Jazz was required to prove that the LFFPs in the two shipments were

outside the scope of the Exclusion Order.  *See id.* at 1329.  This required Jazz to show that the

spent disposable camera "shells" refurbished in China resulted from disposable cameras that had

undergone a patent-exhausting "first sale" in the United States and that the reloading operation

effected a "permissible repair," rather than a "prohibited reconstruction," of the original camera.

*Id.* at 1333.  During a four-day bench trial on October 12-14 and October 18, 2004, plaintiff

produced documentary, videographic, and testimonial evidence relevant to the issues of

permissible repair and first sale.  *Id.* at 1330, 1340-47.  The government did not introduce its own

evidence at trial to demonstrate that Jazz's importations were not entitled to admission.  *Id.*

at 1340-41.  Instead, the United States challenged the sufficiency of the proof of admissibility

offered by Jazz, arguing that Jazz had failed to meet its burden of rebutting a statutory

presumption that the decision by Customs to exclude the merchandise was correct.  *See id.*

at 1333, 1340-41; 28 U.S.C. § 2639(a)(1) (2000).  The government argued that Jazz's factual

showings on the shell collection procedure and the reloading operation failed to satisfy the

burden of proof for the admissibility of any individual camera.  *See Jazz II*, 28 CIT at __, 353 F.

Supp. 2d at 1333, 1340-41.

The imported LFFPs at issue in *Jazz II* had been refurbished by Polytech Enterprise

Limited ("Polytech") at facilities in China.  The majority of these LFFPs were produced from

used shells that Polytech obtained from a collector of shells, Photo Recycling Enterprise, Inc.

("Photo Recycling").  The remaining LFFPs were processed using shells that Jazz acquired from

another shell collector, Seven Buck's Inc. ("Seven Buck's"), and provided to Polytech for

processing.  *Id.* at 1341-42.  The court held in *Jazz II* that plaintiff had produced evidence

sufficient to establish a "first sale" for the LFFPs processed from shells purchased from Photo

Recycling and that these LFFPs were entitled to admission to the extent that Jazz could

demonstrate that these LFFPs could be segregated from the remaining cameras in the two

shipments.  *Id.* at 1347-54.  The court concluded that plaintiff failed to establish a "first sale" in

the United States for the LFFPs processed from the Seven Buck's shells, which accordingly did

not qualify for admission.  *Id.* at 1348-50.  Distinguishing between the two types of shells, the

court concluded that Jazz was unable to produce evidence showing that the Seven Buck's shells

had been collected, directly or indirectly, from photo processors located in the United States.  *Id.*

The court further held that plaintiff produced evidence sufficient to establish that all of the LFFPs

in the two shipments had undergone processing constituting a permissible repair.  *Id.* at 1347-48.

Because the two shipments contained some LFFPs resulting from Seven Buck's shells, the court

issued an order directing Customs, with the participation of Jazz, to conduct an examination of

the merchandise to determine if the LFFPs processed from Seven Buck's shells could be

segregated from the remaining LFFPs in the shipments.  *Id.* at 1352; Order for Expedited

Administrative Determination (Nov. 5, 2004).  The court reopened the trial record to allow the

parties to obtain and to introduce evidence on the segregation issue and considered the

responsive submissions of the parties.  *Jazz II*, 28 CIT at __, 353 F. Supp. 2d at 1352.  The court

concluded that Jazz had established the ability to segregate the LFFPs made from Seven Buck's

shells from the admissible LFFPs, except for certain cartons in which LFFPs from the master lot

number Jazz had assigned to Seven Buck's shells ("Master Lot Number 463") were commingled

with other master lot numbers, for which cartons the court, in entering judgment, denied

admissibility in the entirety.  *Id.* at 1352-54.

Following appeal by Jazz, the government, and Fuji, the Court of Appeals affirmed the

court's judgment in *Jazz II*.  *See Jazz III*, 439 F.3d at 1358.  No party sought a rehearing or a writ

of *certiorari*.

## II.  DISCUSSION

Jazz brings its application for attorneys' fees and expenses pursuant to USCIT

Rule 54.1(a), under which the court may award attorneys' fees and expenses where authorized by

law.  Jazz argues that EAJA, 28 U.S.C. § 2412(d)(1)(A), authorizes the award of attorneys' fees

and expenses in this case.  Pl.'s Application for an Award of Att'y Fees Under the Equal Access

to Justice Act 1 ("Pl.'s Application").  In pertinent part, EAJA provides as follows:

> Except as otherwise specifically provided by statute, a court shall award to a
> prevailing party other than the United States fees and other expenses . . . incurred
> by that party in any civil action . . . including proceedings for judicial review of
> agency action, brought by or against the United States in any court having
> jurisdiction of that action, unless the court finds that the position of the United
> States was substantially justified or that special circumstances make an award
> unjust.

28 U.S.C. § 2412(d)(1)(A).  To award fees and expenses upon an EAJA claim, the court must

determine that the claimant met the following criteria: plaintiff prevailed in the action, the

government's position was not substantially justified, the award of attorneys' fees is not unjust,

and the fee application is timely filed and supported by an itemized statement.  *Comm'r, INS v.

Jean*, 496 U.S. 154, 158 (1990).  An application is timely if submitted to the court within thirty

days of final judgment in the action.  28 U.S.C. § 2412(d)(1)(B).

In addition to those criteria, § 2412(d) imposes financial eligibility requirements.  A

company that operates for profit is an eligible "party" under subsection (d) if it has a net worth

not exceeding $7,000,000 and not more than 500 employees at the time the civil action was filed.

28 U.S.C. § 2412(d)(2)(B)(ii).  Defendant does not argue that plaintiff has failed to satisfy the

financial eligibility requirements.  *See* Def.'s Response to Pl.'s Application for Fees and Other

Expenses under the Equal Access to Justice Act 28 U.S.C. § 2412(d), Title II of Pub. Law 96-

481, 94 Stat. 2325 and Rule 54.1 ("Def.'s Response").  Based on the parties' submissions, the

court finds that plaintiff has satisfied these financial eligibility requirements.  *See* Pl.'s

Application, Ex. A (setting forth plaintiff's bankruptcy petition).

Plaintiff seeks fees and expenses incurred during the appellate litigation culminating in the *Jazz III* decision as well as the litigation conducted before the Court of International Trade in *Jazz II*; there is no indication in the opinion of the Court of Appeals in *Jazz III* or in the briefs plaintiff filed therein that plaintiff sought EAJA fees and expenses for its appellate representation during the *Jazz III* litigation.  Therefore, an awarding of fees and expenses for the appellate phase of the case would require the court to make determinations regarding substantial justification and special circumstances with respect to issues raised before, and decided by, the Court of Appeals. The first question, then, is whether there is any bar to a trial court's making these determinations and awarding fees and expenses accordingly.

The court finds no such bar.  EAJA authorizes the award to be made by "a court." 28 U.S.C. § 2412(d)(1)(A).  *See United States v. 22249 Dolorosa St.*, 190 F. 3d 977, 981 (9th Cir. 1999) (concluding that an appellate court may make an EAJA award but assuming "that in the usual case in which fees are sought for the entire litigation, the determination of whether the government was 'substantially justified' . . . is for the district court to make.").  An EAJA award may include fees and other expenses for an appeal.  *See Jean v. Nelson*, 863 F.2d 759, 770 (11th Cir. 1988) (concluding that EAJA authorizes a lower court to award fees for work done on appeal but reversing the trial court's award of fees incurred in litigation before the Supreme Court because the claimant did not prevail on appeal at that level), *aff'd on other grounds*, *Comm'r, INS v. Jean*, 496 U.S. 154 (1990).

The court next considers whether Jazz qualifies as a prevailing party for EAJA purposes. A prevailing party is one that "succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit."  *Hensley v. Eckerhart*, 461 U.S. 424, 433

(1983) (internal quotation marks and citation omitted).  The government does not contest that

plaintiff prevailed on the part of its claim pertaining to the Photo Recycling LFFPs.  It is

sufficient for this purpose that plaintiff succeeded in obtaining the release of some of the

excluded merchandise and successfully defended on appeal the judgment partially in its favor.

Nor does the government contest Jazz's satisfying the requirements of timeliness and support of

the fee application statement.  Defendant argues instead that plaintiff's application must be

denied because the government's position in the litigation was substantially justified and because

special circumstances exist to make an award unjust.

For the reasons discussed below, the court concludes that defendant, in opposing

plaintiff's EAJA application, has met its burden of establishing that the position it took in the

*Jazz II* and *Jazz III* litigation with respect to the first sale requirement was substantially justified.

The court further concludes that defendant was substantially justified in the position it took in the

*Jazz II* litigation on the issue of permissible repair but was not substantially justified in pursuing

its position on permissible repair before the Court of Appeals in the *Jazz III* litigation.  The court

also concludes that defendant has not established a substantial justification for its contesting,

during that appeal, the Order for Expedited Administrative Determination that the Court of

International Trade issued in the *Jazz II* litigation to address the segregation of Jazz's

merchandise.  The court determines that the positions taken by Customs in the administrative

proceeding resulting in the *Jazz II* and *Jazz III* litigation were substantially justified.  Finally, the

court does not find special circumstances that would render unjust an award pertaining to

attorneys' fees and other expenses that plaintiff incurred during the appellate litigation of these

two issues.

The court, rather than award fees and other expenses at this time, is ordering plaintiff to submit a revised application statement that identifies the fees and other expenses for the specific legal services rendered in litigating before the Court of Appeals the issue of whether the processing conducted on Jazz's imported merchandise constituted permissible repair and the issue of the authority of the Court of International Trade to order an expedited administrative proceeding directed to the segregation of merchandise.

### A.  The Government's Litigation Position Was Substantially Justified in Part

When a party seeking fees and expenses under EAJA has prevailed in litigation against the government, the government bears the burden of establishing that its position was substantially justified or that special circumstances preclude an EAJA award.  *Covington v. Dep't of Health & Human Serv.*, 818 F.2d 838, 839 (Fed. Cir. 1987); *see* 28 U.S.C. § 2412(d)(1)(A). The term "substantially justified" means "justified in substance or in the main–that is, justified to a degree that could satisfy a reasonable person.  That is no different from [a] reasonable basis both in law and fact."  *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotation marks and citations omitted).  That a party other than the government prevailed does not establish that the government's position was not substantially justified.  *Luciano Pisoni Fabbrica Accessori Instrumenti Musicali v. United States*, 837 F.2d 465, 467 (Fed. Cir. 1988).  Instead, the determination of whether to award attorneys' fees is "a judgment independent of the result on the merits . . . reached by examination of the government's position and conduct through the EAJA prism, . . . not by redundantly applying whatever substantive rules governed the underlying case." *Id.* (internal quotation marks and citations omitted).

**Court No. 04-00494**                                                                 **Page 10**

<u>1.  The Government's Position on First Sale was Substantially Justified</u>

The government argued in *Jazz II* that Jazz could not meet its burden on the first sale

requirement unless it could establish by a preponderance of the evidence "that *each and every*

*one* of the cameras contained in the two entries at issue were made with shells first sold in the

United States."  Def.'s Post-Trial Br. 5.  In the post-trial phase of the case, the United States

argued generally that Jazz had failed to establish that each of the LFFPs in the two shipments

satisfied the first sale requirement.  *Id.* at 1.  The government supported its general argument by

citing to testimony by Mr. Zawodny, Jazz's quality manager with oversight responsibility of the

shell sorting process conducted by Polytech.  Mr. Zawodny testified to the effect that it may not

have been possible for Polytech to screen out all "foreign" shells, *i.e.*, shells from LFFPs that

were first sold in a foreign country; the testimony pertained specifically to shells with English-

language labels that may have been first sold abroad in an English-speaking foreign country or

shells from new LFFPs that were labeled in both English and French and that likely were first

sold in Canada.  *Id.* at 10-14; *see Jazz II*, 28 CIT at __, 353 F. Supp. 2d at 1344.  The government

also emphasized that Polytech's sorters were, for the most part, not English-speaking.  *Jazz II*,

28 CIT at __, 353 F. Supp. 2d at 1344.  As the court found in *Jazz II*, the evidence established

that Polytech's sorting process depended on comparing shell packaging to packaging on sample

packages.  *Id.*  Although Mr. Zawodny had testified that, in his opinion, the sorting system is

"quite accurate" and "works well," the court in *Jazz II* was not presented with record evidence

demonstrating that the sorting system was error-free, and the court did not so conclude.  *See id.*

at 1344-45.  In arguing that Jazz's proof fell short of demonstrating that every camera in the two

shipments satisfied the first sale requirement and that, accordingly, all the merchandise at issue should be excluded from entry, the government's argument had a reasonable basis in fact.

In *Jazz II*, the court relied on various findings of fact, reasonable inferences, and conclusions of law in determining that Jazz had demonstrated admissibility of the LFFPs resulting from refurbishing of shells obtained from Photo Recycling.  The record evidence in *Jazz II* relevant to the first sale issue did not consist of documentary evidence, such as sales records, that directly established the original sale in the United States of each LFFP that later was refurbished and imported by Jazz.  *Id.* at 1333.  The court in *Jazz II* concluded that the nature of the business in which Jazz was engaged made obtaining such documentary evidence impracticable.  *Id.*

Jazz instead produced evidence, which consisted in part of testimony that the court found credible, supporting the finding that the Photo Recycling shells, unlike the Seven Buck's shells, were collected, directly or indirectly, from photo processors in the United States.  *See id.* at 1348-49.  With respect to the Photo Recycling shells, the court applied a "presumption of regularity" under which Customs is presumed to have enforced the Exclusion Order to prevent the commercial importation of patent-infringing LFFPs.  *Id.* at 1334.  The conclusion of admissibility also required the court to make certain findings of fact and conclusions of law concerning the issue of "tourist shells," *i.e.*, shells resulting from LFFPs that were first sold outside the United States yet were imported lawfully under a provision of the Exclusion Order allowing for noncommercial importations of LFFPs sold abroad.  *Id.* at 1334-35.  The court explained that because tourist shells could have resulted from these lawfully-imported LFFPs, tourist shells theoretically could be present among shells collected from photo processors in the

United States; the court concluded, however, that the evidence of record supported the finding

that if tourist shells were present in the subject shipments, they were present as a small

percentage of less than one percent.  *Id.* at 1335.  The court found Polytech's sorting process,

although not shown to be capable of removing every foreign shell, to have been sufficient, in the

context of the other facts demonstrated in the case, to establish that Jazz had met its burden of

establishing first sale for LFFPs refurbished from shells collected from photo processors in the

United States.  *Id.* at 1349-50.  The discussion in the court's opinion in *Jazz II* of the evidence

Jazz offered on the first sale issue reveals that the court's conclusions on the admissibility of the

LFFPs from Photo Recycling shells and the inadmissibility of the LFFPs from Seven Buck's

shells depended on the resolution of close factual questions.

        In *Jazz II*, the United States argued for a more stringent interpretation of the first sale

requirement than that ultimately adopted by the court.  The court concludes, nevertheless, that the

government's argument had a reasonable basis in law.  The Court of Appeals established in

*Jazz I* that the permissible repair defense to patent infringement was available to Jazz provided

Jazz could establish both that the first sale of the LFFPs occurred in the United States and that

the refurbishing process constituted permissible repair.  *See Jazz I*, 264 F.3d at 1102-05.  In

applying the permissible repair defense in the circumstances of the Commission's Exclusion

Order, the Court of Appeals described the "first sale" requirement of the defense unambiguously

and identified no exceptions to that requirement.  *Id.* at 1105 (stating that "[the court's] decision

applies only to LFFPs for which the United States patent right has been exhausted by first sale in

the United States.  Imported LFFPs of solely foreign provenance are not immunized from

infringement of United States patents by the nature of their refurbishment.").  At the time the

government advanced its argument on first sale in the *Jazz II* litigation, the nature of the proof

necessary to establish first sale of an imported refurbished LFFP had not been defined in law and,

in this respect, can be viewed as a matter of first impression.  It was reasonable for the

government, during the *Jazz II* litigation, to advocate an interpretation of *Jazz I* requiring a higher

degree of proof on the first sale issue even though the court in *Jazz II*, as discussed previously,

ultimately interpreted the first sale requirement in the context of certain commercial realities of

the LFFP refurbishing business and applied a presumption of regularity that Customs was

enforcing the Exclusion Order so as to preclude the importation of infringing LFFPs.

        The United States also advocated a higher degree of proof of first sale during the

appellate litigation culminating in the decision in *Jazz III*.  Specifically, defendant argued on

appeal that the Court of International Trade erred in applying the presumption of regularity, *i.e.*,

the presumption that Customs was enforcing the Exclusion Order, which aided Jazz in

establishing the first sale of some of the imported merchandise.  Br. of Def.-Appellant United

States 32-34.  The issue of whether such a presumption of regularity was appropriate was not

addressed in *Jazz I* and, accordingly, also was a matter of first impression.

        That the issues under consideration were of first impression does not necessarily render

the position of the government substantially justified.  *See Devine v. Sutermeister*, 733 F.2d 892,

895 (Fed. Cir. 1984).  The government, for example, may not advocate a position that is

unsupportable given statutory, regulatory, and judicial authority.  *See id.*  In *Jazz II* and *Jazz III*,

however, the government's general litigation position advocating a stringent interpretation of the

first sale requirement that was set forth in *Jazz I* was not inconsistent with established principles

of law and, more specifically, was a plausible interpretation of the holding of the Court of

Appeals in *Jazz I*.  As discussed previously, *Jazz I* stated the first sale requirement

unambiguously and identified no exceptions to that requirement.  *Jazz I*, 264 F.3d at 1105.

Plaintiff's principal argument that the government's position was not substantially

justified is that the United States, by declining to put on a case in chief, failed to proffer a factual

justification for the exclusion of Jazz's merchandise and failed to present evidence to rebut the

evidence Jazz presented at trial to establish the admissibility of the LFFPs.  Pl.'s

Application 3, 8-10.  Plaintiff argues further that the government introduced no evidence

showing that Customs had ever inspected the two shipments, either before or during the

proceedings before the Court of International Trade and presented no witness to testify about the

circumstances of the exclusion or the reasons why Customs believed the goods were

inadmissible.  *Id*.  Jazz also argues that the government's litigation position was not justified in

law because, under the decision of the Court of Appeals in *Jazz I*, no absolute ban on the

importation of LFFPs was in place and, accordingly, no exclusion of merchandise was justifiable

absent an inspection.  *Id.* at 9.

The decision by Customs to forego introducing evidence to demonstrate the

inadmissibility of Jazz's LFFPs does not require the court to conclude that the government's

litigation position was not substantially justified.  The government was entitled to rely on a

presumption that the exclusion of the merchandise by Customs was correct, while Jazz bore the

burden of producing evidence demonstrating that the excluded merchandise qualified for

admission.  *See* 28 U.S.C. § 2639(a)(1); *Jazz III*, 439 F.3d at 1353 ("We recognize that the

government was not required to present evidence that the LFFPs at issue were actually processed

from used foreign shells, infringing shells, and tourist shells.  However, in the absence of such

conflicting evidence, the court was entitled to give weight to Jazz's evidence."); *Jazz II,* 28 CIT

at __, 353 F. Supp. 2d at 1333.  Meeting the burden of proof required Jazz to satisfy, by a

preponderance of the evidence, the requirements established in *Jazz I*; among those requirements

was that each individual camera offered for admission be shown to have undergone a patent-

exhausting first sale in the United States.  *Jazz II,* 28 CIT at __, 353 F. Supp. 2d at 1333.

Similarly, a failure by the government to inspect the LFFPs in the two shipments, either

during the detention and protest procedure or during the litigation before the Court of

International Trade, does not compel a conclusion that the government's position lacked

substantial justification.  The findings of fact needed to determine the admissibility of the

merchandise depended in part on evidence that was relevant to the "first sale" issue.  Certain of

that evidence was beyond that obtainable by physical inspection, including, in particular,

evidence on where and how the shells had been collected.  Nor was the government required to

present a witness to testify about the circumstances of the exclusion or the reasons why Customs

ordered it.  As required by statute, the *Jazz II* litigation, in which plaintiff contested the protest

denial, was a *de novo* proceeding, not a review on the administrative record made by the agency.

*See* 28 U.S.C. § 2640(a)(1) (2000).

### 2.  The Government's Position on Permissible Repair Was Reasonable at the Trial Level But Lacked Substantial Justification at the Appellate Level

In *Jazz II* and on appeal in *Jazz III*, the government argued that Jazz failed to establish

that the processing performed on the imported cameras was limited to permissible repair.

*Jazz III*, 439 F.3d at 1353; *Jazz II,* 28 CIT at __, 353 F. Supp. 2d at 1333.  The court concludes

that the government, although proceeding on a reasonable basis in litigating this issue at the trial

level, took on appeal a litigation position on the permissible repair issue that was not

substantially justified, either in fact or in law.

It was reasonable for the government to argue in *Jazz II* that Jazz's factual showing of

permissible repair was inadequate.  During the trial, defendant cross-examined plaintiff's

witness, Mr. Zawodny, on the permissible repair issue, testing the extent of Mr. Zawodny's

personal knowledge of the processing conducted at the Polytech facility in China and challenging

the sufficiency of the videotape evidence that plaintiff offered in support of its claim of

permissible repair.  *See* Def.'s Post-Trial Br. 18-19.  The government argued that the two

videotapes admitted into evidence to demonstrate the processing performed at the Polytech

facility were not sufficiently probative because they were made in 2003, prior to the processing

of the imported LFFPs that occurred in 2004, and because they did not depict the processing for

every kind of camera Jazz imported.  *Id.* at 18.  The government also argued that Polytech had

been found to have engaged in "full back replacements" in the past and that Jazz failed to

establish that use of full-back replacements had ceased in Polytech's facilities.  *Id.* at 18-19.

"Full back replacement" refers to the refurbishing of a Kodak LFFP using a completely new, full-

width back cover, a process found to have infringed Fuji's patents.  *See Jazz II*, 28 CIT at __, 353

F. Supp. 2d at 1332, 1346.

The resolution at the trial level of the factual issues pertaining to the question of

permissible repair required the court to make findings that Mr. Zawodny's testimony on the

nature and extent of the processes performed on the imported LFFPs in China was probative and

credible.  *See id.* at 1348.  The physical evidence on the permissible repair issue was limited to

the above-described videotapes, which were made the year prior to the processing of the two

shipments of imported LFFPs and did not depict the processing of all the types of LFFPs that Jazz imported.  As a result, the court was called on to make significant findings on the extent of Mr. Zawodny's knowledge of the Polytech processes and inventory control systems.  *See id*. Although the court ultimately found that Jazz had established permissible repair by a preponderance of the evidence, a reasonable basis existed on which the defendant could question whether that evidence sufficed.  The reasonable basis for such a questioning is shown by the fact that Jazz had used full back replacements in the past and by the limitations inherent in the type and quantity of evidence, *i.e.*, the videotapes, that Jazz presented to establish the permissible repair of the subject LFFPs.  Plaintiff did not offer any additional physical evidence on permissible repair, such as more contemporaneous or comprehensive videotape evidence, nor did plaintiff introduce documentary evidence such as production records identifying or recording the specific processing steps performed on each LFFP or type or model of LFFP actually present in the two shipments.

Following the court's ruling on permissible repair in *Jazz II*, however, the defendant did not proceed on a reasonable basis in litigating the permissible repair issue before the Court of Appeals.  The argument defendant chose to present to the Court of Appeals on the permissible repair issue unnecessarily required plaintiff to incur a litigation burden and needlessly consumed the judicial resources of the Court of Appeals.

The government argued on appeal in *Jazz III* that the Court of International Trade did not apply correctly the legal test for permissible repair and that it "failed to make the requisite findings of fact as to whether the processes used to make the LFFPs contained in the entries at issue were limited to eight steps as described by the Court in [*Jazz I*], or 19 substeps described by

the Court in [*Fuji*]."  Reply Br. of Def.-Appellant United States 14 (citing *Fuji Photo Film Co. v.*

*Jazz Photo Corp.*, 394 F.3d 1368, 1371 (Fed. Cir. 2005), *aff'g*, 249 F. Supp. 2d 434

(D.N.J. 2003) ("*Fuji*")).  The government argued that the court, by failing to identify "various

minor operations" that occurred in the permissible repair process, left open the possibility that the

processing of the subject LFFPs included a full back replacement step, and also argued that the

Court of International Trade was required to identify in detail the "minor operations" to confirm

that no additional steps were undertaken to process the LFFPs and to confirm that none of the

steps which it identified constituted "impermissible reconstruction pursuant to the Court's

precedent in [*Jazz I*]."  Reply Br. of Def.-Appellant United States 14-15.

The government's appellate argument pertaining to the steps in a permissible repair

process lacked a substantial basis in law.  The argument was based on a misinterpretation of

*Jazz I*, in which the Court of Appeals concluded that refurbishing LFFPs according to the eight-

step process identified by the administrative law judge in the underlying ITC proceeding

constituted permissible repair, and not prohibited reconstruction.  264 F.3d at 1098, 1109.  That

process consisted of eight steps: (1) removing the cardboard cover, (2) cutting open the plastic

casing, (3) inserting new film and a container to receive the film, (4) replacing the winding wheel

for certain cameras, (5) replacing the battery for flash cameras, (6) resetting the counter,

(7) resealing the outer case, and (8) adding a new cardboard cover.  *Id.* at 1098.

In *Jazz II*, the Court of International Trade concluded that Jazz demonstrated that it

engaged in permissible repair, rather than prohibited reconstruction of LFFPs, based on the

following seven-step process undertaken by Polytech: (1) opening of the body of the shell,

(2) replacement of the advance wheel, (3) replacement of the film and of the battery (if a flash

camera), (4) resetting the counter, (5) closing and repairing the case using original parts except

for an additional molded part, (6) repackaging the refurbished camera, and (7) various minor

operations incidental to these processes.  28 CIT at __, 353 F. Supp. 2d at 1346.  Mr. Zawodny's

testimony at trial described minor operations incidental to the six-step process undertaken by

Polytech, including removing labels and wrappings from camera shells, cleaning the shells,

removing dust and debris from the inside of the camera, conducting loading operations under

dark conditions for certain cameras, testing the charge for the flash, and marking the cameras

processed for the U.S. market with an ink dot.  *Id.* at 1345-47.

The government's argument before the Court of Appeals was not based on a plausible

interpretation of the opinion of the Court of Appeals in *Jazz I*.  The eight-step process considered

by the Court of Appeals in *Jazz I* was found by the administrative law judge to constitute

"common steps" conducted by various respondents.  *See* 264 F.3d at 1101.  The Court of Appeals

reversed the Commission, concluding that the eight-step process – which on the record before the

Court of Appeals was the factual ground for the Commission's conclusion of law that prohibited

reconstruction had occurred – instead constituted permissible repair.  *Jazz I* does not hold that

any processing departing from the eight specific steps constitutes, as a matter of law, prohibited

reconstruction.  To the contrary, the Court of Appeals explained in *Jazz I* that "[p]recedent has

classified as repair the disassembly and cleaning of patented articles accompanied by replacement

of unpatented parts that had become worn or spent, in order to preserve the utility for which the

article was originally intended."  *Id*. at 1103-04 (discussing *General Electric Co. v. United

States*, 572 F.2d 745 (Ct. Cl. 1978) and *Dana Corp. v. American Precision Co.*, 827 F.2d 755

(Fed. Cir. 1987)).  Thus, the discussion of the permissible repair issue in *Jazz I* dispels any

suggestion that the Court of Appeals intended to preclude, as prohibited reconstruction, minor

operations that were incident to the overall repair process or implicit in one of the identified

steps.  As the Court of Appeals stated in *Jazz I*, prohibited reconstruction is "'a second creation

of the patented entity.'"  *Id.* at 1103 (quoting *Aro Manufacturing Co. v. Convertible Top

*Replacement Co.*, 365 U.S. 336, 346 (1961)).

On appeal, defendant's mischaracterization of the holding of *Jazz I* was readily apparent

from its misguided argument to the Court of Appeals, as quoted above, that the Court of

International Trade in *Jazz II* "failed to make the requisite findings of fact as to whether the

processes used to make the LFFPs contained in the entries at issue were limited to eight steps as

described by the Court in [*Jazz I*], or 19 substeps described by the Court in [*Fuji*]."  Reply Br. of

Def.-Appellant United States 14 (citing *Fuji*, 394 F.3d 1368, 1371 (Fed. Cir. 2005), *aff'g*, 249 F.

Supp. 2d 434 (D.N.J. 2003)).  The principles governing permissible repair, as elucidated by the

Court of Appeals in *Jazz I*, did not require such findings of fact.  The government's reliance on

*Fuji* was similarly misguided, failing to observe that the district court in *Fuji* cautioned against

semantic distinctions of the very type advanced by the government on appeal.  *See* 249 F. Supp.

2d at 445-46.  Based on the principles governing permissible repair as established in *Jazz I*, the

district court in *Fuji* stated that "[w]hether these refurbishment procedures are counted as four,

eight or nineteen 'steps' is a matter of semantics, as virtually any step can be divided into

multiple 'sub-steps.'  The legal issue is whether the totality of the refurbishment procedures are

of such a nature that they preserve the useful life of the patented article, or whether they in fact

recreate the article after it has become spent."  *Id.* at 446-47.  In *Jazz III*, the Court of Appeals,

after reiterating the principles governing permissible repair and prohibited reconstruction that it

had explained and applied in *Jazz I*, stated that "[w]hile there is no bright-line test for

determining whether a device has been permissibly repaired, it does not turn on minor details."

*Jazz III*, 439 F.3d at 1354.  "Here, the court characterized the seventh step as various minor

operations incidental to the first six steps.  Because the first six steps did not make a new single

use camera, it follows that minor operations which were incidental to those steps also did not

make a new single use camera."  *Id.* (internal quotation marks omitted).  Because the minor

operations undertaken by Polytech, whether considered individually or collectively, did not

constitute the type of process that remotely could be described as a prohibited reconstruction of

the camera under the principles that the Court of Appeals discussed at length in *Jazz I*, the

government's appellate argument to the contrary in the *Jazz III* litigation was baseless.

      Moreover, there was not a factual basis on the record in *Jazz II* on which the government

could ground its appellate argument that the "minor operations" might have included the use of

patent-infringing full width replacement backs for Kodak cameras.  The record evidence in

*Jazz II* on the nature of the minor operations identified those minor operations so as not to

include full back replacements.  The court found, on the basis of testimony by plaintiff's witness,

Mr. Zawodny, that "full back replacements . . . are not used for production of Jazz cameras

intended for sale in the United States."  *See Jazz II*, 28 CIT at __, 353 F. Supp. 2d at 1346.  The

government presented no evidence to the contrary.  The court gave weight to Mr. Zawodny's

testimony, finding it both credible and probative.  *Id.* at 1344.  Undeterred by the lack of any

evidentiary support in the record on appeal, the government argued that full back replacements

may have occurred at the Polytech facility when the subject LFFPs were refurbished.  The Court

of Appeals rejected the government's argument, observing that "[e]vidence in the record supports

the court's determination, demonstrating that at the time the subject LFFPs were produced,

Polytech had stopped using full back replacements." *Jazz III*, 439 F.3d at 1355.

Defendant further argued on appeal that the Court of International Trade erred in relying

on the two 2003 videotapes of Polytech's factory, alleging that the videotapes were not relevant

and that, in crediting the videotapes, the court employed "novel standards." Br. of Def.-

Appellant United States 26-30. Defendant contended that those standards departed from "the

standards applied by other fora in deciding the permissible repair defense." Reply Br. of Def.-

Appellant United States 12. The government argued that the tapes "did not even purport to

demonstrate the actual processes used to produce the subject LFFPs" and argued that the

Commission had, in a prior proceeding, rejected this evidence because it depicted repair of

Kodak shells using half back, not full back, replacements. Br. of Def.-Appellant United

States 27 (asserting that "[t]he Commission found this evidence to be adequate to demonstrate a

permissible repair process *only* for Kodak shells using half backs, not full backs. The

Commission specifically found that this evidence was *insufficient* to satisfy this Court's

requirements for a permissible repair process with regard to Fuji, Konica, and Concord shells."

(citations omitted)).

The government was not substantially justified in arguing on appeal that the videotapes

were not relevant evidence. Plaintiff offered the tapes to demonstrate the nature of the repair

operations conducted at the Polytech plant in Shenzhen, China, the very plant that produced the

LFFPs in the case. The relevance of this evidence to the permissible repair issue in *Jazz II* was

readily apparent once plaintiff established an adequate evidentiary foundation. Mr. Zawodny, in

testifying regarding the steps of the permissible repair process depicted in the videotapes at issue,

stated that the operations depicted in the videotapes were still being performed during the

summer of 2004 when the imported LFFPs were produced in the Polytech Shenzhen factory.  He

addressed in his testimony the repair of the various brands of LFFPs.  The Commission's

rejection of the evidence, in a different proceeding, on the ground that it was confined to repair of

Kodak shells using half back replacements did not support the exclusion of the videotape

evidence for the narrow purpose for which it was offered at trial in *Jazz II*.

The court also finds no rational basis for defendant's appellate argument that in crediting

the videotapes, the court employed novel standards that departed from the standards applied by

other fora in deciding the permissible repair defense.  For the reasons discussed above, there was

no basis in law under which defendant plausibly could contend that the permissible repair

standard as applied by the court in *Jazz II* departed from that established in *Jazz I*.  Nor was that

standard inconsistent with the standard applied by the district court in *Fuji*, which, as noted

previously, was a standard not premised on semantic distinctions.  The courts that have

considered the LFFP permissible repair issue have based their decisions, properly, on whether the

particular processes employed constituted permissible repair or prohibited reconstruction,

declining to draw meaningless or trivial distinctions from the descriptions of the various steps or

sub-steps.

### 3.  Defendant's Appellate Argument on the Segregation of LFFPs Was Not Substantially Justified

Before the Court of Appeals, defendant argued that the Court of International Trade erred

in *Jazz II* by issuing the November 5, 2004 Order for Expedited Administrative Determination.

That order directed Customs to conduct a physical examination of the merchandise in the two

shipments in the presence of plaintiff's representatives and ordered Customs, in effect, to report

to the court on whether the packaging and labeling of the imported LFFPs afforded a means of

identifying the merchandise in Master Lot Number 463, the master lot number pertaining to the

LFFPs made from Seven Buck's shells.  Claiming that "[u]nprecedented" and "burdensome"

administrative responsibilities had been improperly imposed upon Customs, the United States

argued to the Court of Appeals that the Court of International Trade should have sustained

Customs' exclusion based on the holding that the LFFPs resulting from Seven Buck's shells were

inadmissible but, instead, "improperly ordered Customs to assist Jazz in identifying the

inadmissible merchandise and segregating it from merchandise deemed to be admissible."  Br. of

Def.-Appellant United States 53, 55.  The government on appeal argued, further, that "the trial

court impermissibly usurped the role and discretion of Customs by ordering Customs to

supervise Jazz while it segregated the merchandise that the court held to be properly excluded

from that it deemed admissible.  The trial court exceeded its authority by directing Customs to

assist in the segregation and in ordering release of the goods, without taking into account the

many elements that Customs might have considered, such as those in [19 C.F.R. § 141.52], as

well as the other statutes and regulations in place that dictate the release and entry of

merchandise."  *Id.* at 56.  In reference to those "other statutes and regulations," defendant's brief

clarified that "[f]or example, Jazz could have filed a warehouse entry pursuant to 19 C.F.R.

§ 144.1, withdrawn its entries for exportation pursuant to 19 C.F.R. § 144.37, and then re-

imported that merchandise which the court found to be incorrectly excluded.  Or, alternatively,

Jazz could have availed itself of the Foreign Trade Zone Acts [*sic*], 19 U.S.C. § 81a, to deal with

its merchandise."  *Id.* at 57.

The appellate argument that the government directed to the court's order on segregation was pointless.  Defendant's brief to the Court of Appeals fails to explain how directing Customs to participate in the brief proceeding commenced by the Order for Expedited Administrative Determination was beyond the authority of the Court of International Trade.  The government's arguments are inconsistent with the scope of judicial authority granted by 28 U.S.C. § 2643(b), which statutory provision was expressly cited in the court's order.  As Congress provided in 28 U.S.C. § 2643(b), "[i]f the Court of International Trade is unable to determine the correct decision on the basis of the evidence presented in any civil action, the court may order a retrial or rehearing for all purposes, or may order such further administrative or adjudicative procedures as the court considers necessary to enable it to reach the correct decision."  At the time of issuing the Order for Expedited Administrative Determination, the court lacked a factual record on which it could decide the question of whether the merchandise in Master Lot Number 463 could be segregated, in whole or in part, from the remainder of the merchandise in the two shipments. The answer to that question required only an examination of the packaging and labeling of the two shipments and a comparison to Jazz's business records pertaining to Master Lot Number 463.  The court's resort to its authority under 28 U.S.C. § 2643(b) allowed an expeditious resolution of this straightforward factual question.

The court finds no substantial justification for the government's argument that Customs was impermissibly burdened by having to comply with the court's order.  The government's briefs fail to cite a rule or principle under which the routine obligations imposed on Customs by the court's order could be adjudged contrary to law.  Following the issuance of the order, defendant raised no objection in the *Jazz II* litigation directed to the burden on Customs.  As the

Court of Appeals concluded in *Jazz III*, the burden of establishing that the admissible merchandise could be segregated from the inadmissible merchandise fell upon Jazz, not Customs, as reflected in the judgment entered in *Jazz II*.  *See Jazz III*, 439 F.3d at 1356.

Finally, the government's appellate argument concerning bonded warehouse and foreign trade zone procedures was misguided and irrelevant to the question of the court's authority to order an administrative proceeding and to reopen the record to resolve a factual issue affecting the judgment the court was preparing to enter.  *See* Br. of Def.-Appellant United States 55-57. The implication of the government's argument is that because bonded warehouse and foreign trade zone procedures exist under the tariff laws, the court was required to force Jazz to resort to one of these procedures rather than resolve the segregation issue directly through the expedited administrative proceeding.  The government cited no law or principle that would support such a novel contention, which if adopted by the court could have delayed the proceedings unnecessarily.  The government's argument appeared to regard the exclusion of Jazz's merchandise by Customs, at least in some respects, as final.  Such was not the case.  The legality of the exclusion of all of the merchandise was the very issue under consideration by the court in *Jazz II*.  That issue had not been resolved at the time the court issued the Order for Expedited Administrative Determination, at which time judgment had not yet been entered.

In summary, during the appellate phase of the litigation neither the position advocated by defendant on the permissible repair issue nor the position it advanced on the segregation issue was substantially justified.  Plaintiff, and the Court of Appeals as well, were burdened unnecessarily by issues that the government should not have raised.

B.  The Government's Position at the Administrative Level Was Substantially Justified

Under the applicable scope and standard of review, the court did not consider the actions

of Customs at the administrative level during the *Jazz II* litigation.  *See Jazz II,* 28 CIT at __, 353

F. Supp. 2d at 1333 (citing 28 U.S.C. § 2640(a)(1)); *see also ITT Corp. v. United States*, 24 F.3d

1384, 1388-89 (Fed. Cir. 1994) (interpreting § 2640(a) to require a court to make its own

findings of fact rather than rely on the facts on the agency record).  Under *de novo* review, the

court does not examine the reasonableness of Customs' conduct but instead presumes that the

factual determinations made by Customs are correct.  *See* 28 U.S.C. §§ 2639(a)(1), 2640(a)(1).

Plaintiff does not request an EAJA award for the attorneys' fees and other expenses

incurred during the proceedings before Customs.  Nonetheless, because the denial of the protest

by Customs caused plaintiff to be put through the expense of commencing and maintaining the

litigation in *Jazz II*, the court considers whether the administrative position taken by Customs

leading to the *Jazz II* litigation was substantially justified.  *See*, *e.g.*, *ICI Worldwide, Inc. v.

United States*, 14 CIT 201, 202 (1990) (stating that "[b]ecause Customs's conduct in denying the

protests was unjustified, the fees and expenses of this action are to be awarded even though

defendant admitted liability in its answer to the complaint herein.  Defendant's reasonable

litigation conduct does not change the agency's prior conduct.  Plaintiff should not have been put

to the expense of commencing a lawsuit.").  In this case, the court concludes that the actions by

Customs in excluding the two shipments of LFFPs and denying the protest had a reasonable basis

in fact and law.

In its EAJA application, plaintiff argues that at the administrative level, Customs never

inspected its merchandise, initially excluded its merchandise based upon administrative

requirements "adopted in contravention of Administrative Procedure Act (APA) rulemaking,"

and, even after rescinding these requirements, declined to release plaintiff's goods.

Pl.'s Application 8.  However, Jazz did not present Customs with conclusive evidence

establishing that the LFFPs were outside the scope of the Commission's Exclusion Order.  As

part of its protest submission, Jazz provided Customs with "documentary and video evidence of

the 'repair and alteration' processes performed at various Chinese plants engaged in the

permissible repair of the cameras"; the determination of the administrative law judge in a

Section 337 enforcement proceeding, *In the Matter of Certain Lens-Fitted Film Packages*, Inv.

No. 337-TA-406, Enforcement Proceedings (II) (June 18, 2004), which concluded that the repair

process at the Polytech facility constituted "permissible repair"; and an affirmation by the Chief

Executive Officer of Jazz.  *See* Mem. of P. & A. in Supp. of Protest 7-8, Exs. E, F (Sept. 26,

2004).  Although plaintiff later introduced, during the trial in *Jazz II*, a substantial amount of

evidence adduced from testimony, and the court relied on this evidence in concluding that the

subject cameras purchased from Photo Recycling qualified for admission, *see Jazz II*, 28 CIT

at __, 353 F. Supp. 2d at 1341-47, not all of that evidence was presented to Customs during the

administrative process.  *See* Def.'s Resp. 5, 20 (stating that "Jazz's protest, and the information

submitted by Jazz to Customs, consisted of legal arguments and did not include the testimony

and documentary proof later presented to the Court" and further stating, in reference to Pl.'s

Application, that "Jazz acknowledges that it did not present testimony to Customs during the

administrative protests.").  Therefore, Customs was required to reach its position at the

administrative level based on a factual record even more limited than the record made before the

court in *Jazz II*.  Given the limitations of the factual showing made at the administrative level,

Customs was justified in then deciding that Jazz presented insufficient evidence to establish the admissibility of its merchandise.

The administrative position taken by Customs in excluding the merchandise from entry and denying the protest did not lack a legal justification.  At that time, the "first sale" requirement of the permissible repair defense was relatively new, with some parameters yet to be defined by the courts.  The Court of Appeals in *Jazz I* did not identify every possible type of factual showing that could establish first sale and was not presented with a record requiring it to do so.  Specific legal issues raised by the evidence Jazz produced at trial in the *Jazz II* litigation later were clarified by the Court of Appeals in *Jazz III*.

In summary, the administrative position of Customs was justified to a degree that could satisfy a reasonable person.  *See Pierce*, 487 U.S. at 565.  Customs at that time did not press a tenuous position without factual or legal foundation.  *See Gavette v. Office of Personnel Management*, 808 F.2d 1456, 1467 (Fed. Cir. 1986).

<u>C.  Special Circumstances Do Not Exist to Make an Award Unjust</u>

Having concluded that defendant United States has not demonstrated substantial justification for its appellate positions on the permissible repair and segregation issues, the court considers whether, under EAJA, "special circumstances make an award unjust."  28 U.S.C. § 2412(d)(1)(A).  The court does not find such circumstances.  Where the government unsuccessfully advances novel and credible legal theories in good faith, or where an area of law is unsettled, the government may defend its actions for EAJA purposes by alleging the existence of special circumstances.  *Traveler Trading Co. v. United States*, 13 CIT 380, 384, 713 F. Supp. 409, 413 (1989).  "'This 'safety valve' helps to insure that the Government is not deterred from

advancing in good faith the novel but credible extensions and interpretations of the law that often

underlie vigorous enforcement efforts.  It also gives the court discretion to deny awards where

equitable considerations dictate an award should not be made.'" *Devine*, 733 F.2d at 895-96

(quoting H.R. REP. NO. 96-1418, at 11 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4984, 4990).

    At the appellate level, the government did not advance a credible legal theory on the issue

of permissible repair or the issue of segregation.  Instead, despite lacking a plausible legal theory

and a suitable factual record, defendant caused plaintiff to waste resources responding to its

baseless appellate arguments that the resolution of the permissible repair issue in *Jazz II* was

unsupported by necessary findings of fact and incorrect as a matter of law.  Equally baseless was

defendant's appellate argument that the court lacked authority to order an expedited

administrative proceeding to resolve issues of segregating merchandise, when such a proceeding

was within the court's powers granted by statute.

### III.  CONCLUSION AND ORDER

    For the reasons discussed herein, the court concludes that the positions taken by

defendant in the *Jazz II* litigation and at the administrative level were substantially justified but

that defendant was not substantially justified in the litigation positions presented to the Court of

Appeals on the issues of permissible repair and segregation of merchandise.  The court further

concludes that special circumstances do not exist in this case that make an award under EAJA

unjust.  Accordingly, upon consideration of Plaintiff's Application for an Award of Attorney

Fees Under the Equal Access to Justice Act, defendant's response thereto, and all other

submissions and proceedings herein, it is hereby

**Court No. 04-00494**                                                        **Page 31**

     **ORDERED** that Plaintiff's Application for an Award of Attorney Fees Under the Equal Access to Justice Act be, and hereby is, conditionally GRANTED IN PART and DENIED IN PART; and it is further

     **ORDERED** that plaintiff shall file with the Clerk of the Court, by August 31, 2007, a revised confidential application statement prepared in accordance with this Opinion and Order that identifies the specific legal services rendered in litigating before the Court of Appeals the issue of whether the Court of International Trade erred in holding that processing conducted on Jazz's imported merchandise constituted permissible repair and the issue of the authority of the Court of International Trade to order an expedited administrative proceeding directed to the segregation of merchandise, and any expenses incurred in connection with the performance of such services for which plaintiff seeks reimbursement.

 

                                                /s/ Timothy C. Stanceu
                                                Timothy C. Stanceu
                                                Judge

Dated: July 16, 2007
       New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                            Deputy Clerk